Good morning, Your Honors. May it please the Court, my name is Stephanie Parent, and I represent the appellants at this matter, the Klamath-Siskiyou Wildlands Center and Oregon Wild. I'd like to try to reserve five minutes of my time for rebuttal. Your Honors, 11 years have gone by since the Forest Service last analyzed the effects that are going to occur from the logging in the Low Meadow timber sale. This analysis would meet the dual goals of NEPA to allow the agency to engage in informed decision-making and to allow the public to participate and potentially influence that decision-making process. Since that time, there have been changed circumstances, most notably the destruction of 120,000 acres of spotted owl habitat by the Biscuit Fire, as well as significant studies revealing that the northern spotted owl's health is further at risk, in addition to the loss of habitat from the fire and logging because of new threats to the owl, including the barred owl, which has invaded its territory. The regulation is clear that, based on significant changed circumstances and new information, the Forest Service must supplement its analysis where that information is relevant to the environmental concerns and has a bearing on the proposed action or on its impacts. Now, the standard of review here is the arbitrary and capricious standard of review. However, if the Court examines the record in this case, it simply does not support the Forest Service's decisions in its 2005 memo and its 2007 memo not to supplement the record. K.S. Wilde's burden here is the same as it would be to prepare an EIS in the first instance, as stated in Marsh v. ONRC. The plaintiff appellants need only raise substantial questions that there may be a significant effect that will occur. K.S. Wilde has done so here. I'm going to first address the issue that the Forest Service raised in its answering brief, that there is no owl habitat that will be logged. Secondly, I'll address the Biscuit Fire and its impacts, and finally, the new information contained in the owl studies. With respect to whether or not owl habitat will be logged by the low-meadow timber sale, first, this issue has been raised in the appellant's answering brief and really was not briefed below. Below, the Forest Service relied upon the 2007 memo. The Forest Service's 2000 memo at ER 107 addresses the new information in the owl reports and says that it is relevant to the low-meadow timber sale, although it does conclude that it's not significant. requiring supplementation. The current record does not support the Forest Service's argument that no owl habitat will be logged by the project. Based on the record, K.S. Wilde has raised a substantial question that it will be logged. We need to review in detail the record to show that there is no support for the argument that no owl habitat will be logged. First, in 1997, excuse me, 1996, in the biological evaluation, the Forest Service found that the spotted owl is an inhabitant of the project planning area, ER 41. Based on the fact that- In the record that there are owls nest in the area to be cleared? Absolutely, Your Honor. From 1989 to 1993, because of the fact that the area has a high probability of species occurrence, that's ER 42, the Forest Service conducted surveys for the owl and found four owl activity sites. It has then buffered those areas, and those areas will not be logged by the project. However, there are owls in the area, and that's why the surveys occurred. The completion of the survey was in 1993, now 15 years ago. In addition, the Forest Service anticipated that there may be more owls coming into the area, because it stated in the BA at ER 42, if in the future any new sites or heavily used roost areas are located within or near a sale unit, a buffer should be marked around the site. In February of 1996, the Forest Service concluded that, based on the way they had drawn the units, they would not log any suitable owl habitat, but that 66 acres of dispersal habitat may be degraded. And that's ER at 43. But now, Your Honors, 12 years has passed since the biological evaluation. We have to look at the Forest Service's own most relevant definition of what owl habitat is in this area. To remind the Court, the Low Meadow Timber Sale is in southern Oregon in the coastal range. As cited in my briefs, these forests mature much more quickly than forests in other parts of the owl range, like in the Cascades or in the northern Cascades. In the Biscuit Fire EIS, which is adjacent to this project area, the Forest Service defined nesting roosting habitat is that habitat dominated by trees, 21 inches diameter at breast height or larger, and with a 40% or greater canopy closure. Dispersal or foraging habitat is only trees 9 inches or greater and a canopy closure of 40%. That's in the Forest Service's SCR at 550. We know that back in 1997, the Forest Service said the trees in that area were 10 to 40 inches. That was in 1997. They're certainly larger at this time. That's ER at 54 to 55. And in 2007, in its memo, the Forest Service described this as a, quote, large tree forest. So it seems that at least one of the criteria in the Biscuit Fire EIS for the definition of owl habitat is met here. We have very large trees in this area. These stands started developing in 1910, so we also know that the trees are nearly 100 years old. The Forest Service, in its brief, Those trees stay, right? Excuse me. Those trees stay. I'm sorry. The 100-year-old trees stay, right? What they say they're going to log are any trees that were up to 40 inches at the time of the 1997 decision. So their intention is to put the area back to what they estimated was in 1910. So any trees that began growing 1910 or later, based on their assessment, are the trees that will be logged. There are some trees that will be retained that may have some attributes. Yeah, the trees that are over, what, 40 inches in diameter? The trees that are over 40 inches at the time in 1997 are supposed to be retained by the project. All the Forest Service relies on to say that no owl habitat will be logged is the 1996 BE, which is very dated, as well as one single statement in a 2004 site visit note that says, Still no effect on TES, which stands for Threatened Endangered Species, which includes the northern spotted owl. Your Honors, this one statement in the record is simply a conclusion that has no other support in the record and is not something that this court can rely upon to say that no owl habitat will be logged. The case law amply supports this. In Arizona, cattle growers cited in our brief, this court has held that it cannot defer to an agency statement that isn't based on any fact. We have no data in this record that shows that the Forest Service in its one statement actually looked at the size of the trees and looked at the canopy closure to determine whether or not it met its own definition of what suitable, excuse me, nesting, roosting, foraging, or dispersal owl habitat is. Moreover, this court recently issued an en banc decision, the Lands Council v. McNair, where it said that there must be extraordinary deference given to the agency in most circumstances. However, it did say that where there's no data or explanation of the methodology that the agency uses when looking at habitat, this is arbitrary and capricious because there's no support for it in the record. And that's the McNair case at Star 13, and it was citing the Earth Island Institute case. Moreover, Your Honors, the last survey for the owls was completed in 1993. That's 15 years ago. In the en banc decision in Lands Council v. McNair, the court also held that where habitat data information is so outdated, it can't be relied upon the agency, and therefore any decisions relying upon that are arbitrary and capricious. And that was McNair at Star 14, citing the Lands Council v. Powell. Moreover, Your Honor, with the vast amount of habitat that was destroyed by the Biscuit Fire, it's very likely that this area, which is right on the perimeter of the fire and maintains some of its forests, has had owls move into the area, as was anticipated in the BE more than 12 years ago. Your Honor, I'd like to address next the Biscuit Fire and the changed circumstances that have occurred in the area that make it significant so that here the Forest Service needs to supplement its NEPA analysis, last done in 1997. To what degree was this addressed in the fire recovery EIS after the Biscuit Fire? Your Honor, the Forest Service does argue, as well as CLR Timber, that the Biscuit Fire EIS addressed the low-metal timber sale and it need not do it again. First, I want to point out that the 2007 memo that the Forest Service, in which it concludes that it need not supplement its NEPA analysis, does not rely upon the Biscuit FEIS to say that it looked at all the effects of the low-metal timber sale. Nonetheless, if you look at the Biscuit Fire EIS, which the government has submitted nearly in its entirety, to this Court at Forest Service Supplemental ER 569, there's only two sentences that address the cumulative effects on late successional habitat, which is equated with nesting and roosting habitat in the Biscuit FEIS. It says that the activities identified in Table 3.1, which does include the low-metal logging project, were reviewed to assess whether, in combination with the likely effects of the Biscuit recovery project, whether there would be any cumulative effects to late successional forest habitat. Based on that review, no activities with cumulative effects were identified. So to the extent that they looked at the project, they concluded that there were no activities that would have any cumulative effects on late successional habitat. The record is not entirely clear, Your Honor, but I would submit that there are two likely reasons for this. The first is that this record, excuse me, the documents for the low-metal project are extremely old and outdated, and it's most likely that the Forest Service, who did this Biscuit fire analysis as quickly as possible because it was a post-fire burned area and they did wish to log the burned areas quickly, looked at the documents for the low-metal timber sale, and it said, we're not going to log any suitable habitat. There was never any indication in this record or in the FEIS for Biscuit that those records were updated to demonstrate that now this area actually is owl habitat. And so they concluded that there were no other activities going to have an impact on late successional habitat. So I think it's simply a mistake in the Biscuit FEIS that they concluded there were no other projects having late successional impacts. And, excuse me, I would refer the Court to Lands Council v. Martin, 529F30-1219 at 1232, and I apologize that was not cited in my brief, which talks about where there's an error, just a simple error in the brief that's still not adequate to meet the NEPA analysis duties. Moreover, Your Honors, the Biscuit fire recovery project burned only areas that were severely excuse me, logged only areas that were severely burned. As a result, the Forest Service's position was that it was not logging any late successional habitat, but it no longer was late successional habitat. Therefore, their conclusion that there was no cumulative effect makes sense. When you look at the fact that the BE is old and says no owl habitat will be logged, and the Biscuit fire recovery project was not logging any late successional habitat. So there were no effects to accumulate. Moreover, Your Honor, as we've argued in our briefs, these two sentences in the Biscuit fire EIS are simply too general to apply to this site-specific sale, and it's now been six years since the Biscuit fire burned, and it's been four years since the Biscuit FEIS, and those recovery projects have, in fact, been implemented. So now we can look at the reality of the effects of the Biscuit fire EIS projects, in addition to the logging that will happen in the Low Meadow project. We don't have to rely upon the predictions any longer. Now we have the facts, and those need to be looked at in a supplemental environmental analysis for this particular project area. I suppose the Forest Service might, I guess, express some concern at one point on that you've got a fast-growing forest, and things move slowly, especially when they're challenged, and that they'll always have to file another supplemental environmental assessment, because things will have changed since the last time they did it. Your Honor, certainly the courts have held that that is a problem with supplemental environmental analysis, but that's not the facts of this case here, Your Honor. It's been 11 years since they last analyzed the impacts of this logging sale, and in those 11 years, we've had some extraordinary changes to the area, most importantly impacting the northern spot of Owl. The Biscuit Fire, quote, in a few short weeks destroyed over four times more spotted owl habitat than timber harvest did over the past five decades. That's Forest Service supplemental ER at 544. I want to remind the Court that the Owl was listed because of loss of habitat from both fire and logging, and now the Biscuit Fire, over five times what has happened in the last five decades. That's extraordinary. Two major effects from the fire that changed the circumstances that relate to the impacts of the low meadow timber sale are that it burned the owl habitat, as we've shown in our briefs, a significant amount of the owl, nearly half of all the owl habitat that existed within the fire perimeter was burned. This sale is going to log more owl habitat, and it's not going to log habitat that's burned. It's going to log green trees. Secondly, Your Honor, where did the owls go that were living in the Biscuit Fire area where nearly 120,000 acres of its habitat was burned? It's very likely that these owls have dispersed into the perimeter areas, which is exactly where this low meadow project is located. Most importantly for this Court's review, the 2005 and 2007 memos do not address this relevant factor as it must of what are the effects on the wildlife that are dependent upon this habitat in the post-fire environment. Do you want to reserve some of your time? I would, Your Honor. I'll just finish this point. Thank you. If you look at the 2007 memo very closely, what the Forest Service did was simply look at the Biscuit only to determine whether or not it was still justified in cutting the trees in order to create a meadow. It never looked at it with respect to what are the effects of that proposed logging going to be. Thank you, Your Honor. May it please the Court, my name is Mary Gay Sprague. I represent the Forest Service in this case, and I plan to use 13 minutes, and counsel for CLR Timber will use the remaining seven minutes of our time. The issue to be decided in this case is whether the Forest Service acted arbitrarily and capriciously in determining that the Biscuit EIS adequately addressed the significant changes of the Biscuit fire, and that there were no other issues of significant value to the decision whether to proceed with the low meadow project that would warrant a supplemental environmental assessment. I'd like to address four points of disagreement with K.S. Wilde on this appeal. The first is the standard of review, which K.S. Wilde acknowledges is the arbitrary and capricious standard, but in fact does not apply that standard to the record in this case. The second critical issue is what is the record in this case. Where plaintiffs argue that an agency should have prepared a supplemental EA, that standard is applied to the record developed in the district court after the agency has had an opportunity to respond to the specific issues presented by the plaintiff. The third issue I'd like to address is that plaintiffs here are raising new factual issues that they did not explain to the agency before they sued, that they did not fairly present to the district court, and did not fairly present in the opening brief in this court. And those are the important issues of whether suitable habitat will be logged through this project and whether dispersal habitat will be affected by the project. And number four is the point whether the Biscuit FEIS sufficiently addressed the impacts of the fire on this particular project, and it is the Forest Service position that it did. With respect to the arbitrary and capricious standard, the governing case is, of course, Marsh v. Oregon Natural Resources Council. An agency's decision that a supplemental EA is not warranted is reviewed under the deferential arbitrary and capricious standard. That is because what constitutes a significant change in circumstances or significant new information is a factual inquiry that requires the technical expertise of the agency. Review in court, therefore, owes considerable deference to the agency's resolution of these factual issues. KS Wilde has said that its burden is low. All it has to do is point out that there might be a substantial impact, and then the burden is on the agency to take it from there. And they rely primarily for this point on Klamasiskia Wildland Center v. Booty, in which this Court did say in that context that the burden was low. But in the Booty case, the BLM had made a legal determination that an amendment to a plan was not an action that required NEPA analysis. There was no factual inquiry there. And in that context, the Court said, no, this is a decision that requires NEPA analysis. Booty does not in any way undercut the Marsh case and the other decisions of this Court, which acknowledge when an agency is making a technical determination of significance that the arbitrary and capricious standard applies. The burden, therefore, is on the plaintiffs to show that the Forest Service made a clear error of judgment on that point, and in our view, they have not met that burden. The fundamental, in our view, misinterpretation of K.S. Wild is in what constitutes the record in this case. This is not a case where there is a firm administrative record at a particular point in time, because there's an ongoing obligation to continue to assess new circumstances and new information. This Court recognized in Friends of the Clearwater v. Dombeck that NEPA doesn't require an agency to prepare a formal NEPA document on the decision whether to supplement. As the Court said, if there were a requirement to prepare a formal document with specificity, then the decision whether to supplement would be as burdened as supplementing itself, and that is not a burden that is put on the agency. Instead, the agency prepares informal documents at appropriate intervals to, for its own purposes, to document whether there are new changed circumstances. Obviously, the district ranger doesn't come into work every day and write on a piece of paper, still no change, still no significant new information. They have to figure, they have to focus on what is a change and what is significant. Now, at the same time, the Forest Service does have this independent obligation to continue to assess the situation. It can't sit there like the Maytag repairman waiting for a plaintiff to call it and say, you should take a look at something. But, of course, the Forest Service didn't just sit by waiting for K.S. Wild to call it and say, why don't you take a look at this. In 2002, the Biscuit Fire burned through the forest, 500,000 acres. Anyone would acknowledge this was an extraordinary circumstance. And as soon as the fire was out, the Forest Service commenced to analyze the impacts of that fire on a whole host of projects that had been under, that had been planned for the forest or might be planned in the future. The Forest Service suggested, in reference to that, that the real target of that EIS was the logging of the burned area, and that that's really what it was assessing. Well, Your Honor, there's a component of the Biscuit Fire recovery project that was specific to meadows. And that is that a component of the recovery project was the removal of encroaching trees on 700 acres of meadows within the burned area. And they, therefore, had to look very specifically at what did this fire do to our plans for meadow restoration. The plans for the forest overall are to restore the historical meadows. About 1 percent of the forest is presently meadow habitat, and another 1 percent is historical meadow that has been encroached. Over the decades, by the conifer trees, because of the Forest Service fire suppression activities. So because it was looking at restoration of meadows within the context of this project, it very specifically asked, do we still need meadows? Do we still want to proceed, or do we need to save every last acre that could become a meadow? Do we want to save every last acre that could become late successional habitat at some point? Do we want to encourage all of our acreage to become late successional habitat for the spotted owl or not? And, therefore, the Forest Service had to undertake a very detailed analysis of all the 56 species of concern in the forest, which of them rely on the forest habitat, which of them rely on the meadow habitat. Would the sacrifice of the meadows for the meadow species be worth it to the species that depend on the late successional habitat? And after a very detailed analysis, the Forest Service said, no, it's not worth it. We're going to proceed with our plans for meadow restoration, both within the perimeter of the burned area and outside. And the low meadow recovery project, the restoration project, was specifically identified in the FEIS as a project they were taking into account in making this decision. And so we just simply disagree that the level of specificity was not there because of this. And when plaintiffs say that the Biscuit FEIS has two sentences on the meadow recovery project, that's not true. They're talking about the impacts of the fire on meadows and meadow restoration plans. In our view, that is simply inaccurate. They may be arguing that it's not addressed to spotted owls. It's addressed to sort of just meadows as part of the forest plan. The impact, but, Your Honor, the spotted owl, as a threatened species, is was a specificity of the project. It was a specific interest in the Biscuit FEIS. And the Forest Service carefully mapped on the landscape level the area of dispersal habitat and suitable habitat that survived the fire and was burned in the fire. And it's interesting to note that in the supplemental excerpts of record, we include the fire hazard, the fire hazard, and the fire hazard. And we included a map, 3-5, which is at supplemental excerpts of record 619, which shows the green is the dispersal habitat and suitable habitat that survived the fire, and the red is the suitable and dispersal that was lost in the fire. The very next page, you have the map 3.6. This is page 620. It, again, shows the same area and maps the meadow treatment areas that are planned, including the proposed meadow expansion. And to understand how this Biscuit FEIS relates to this project, you have to understand where the project is. And the project, if you see on the west side of the burn area, marked by a red line, is the Biscuit FEIS. And if you see on the east side, marked by this dark line, there's a part about halfway up that punches in, and this is the Chetco River. And in that area that's punched in, that little finger that sticks in, that's where the Low Meadow Project is. And the eastern units of this project are right on the boundary line, that dark line, because they were just within the burned area. And the western units, High Prairie and Low Prairie, are outside the burned area. Well, I only have the color picture. Your Honor, that map is here because that is not... I don't have the other one you just referred to. This is in the supplemental excerpts of record, Your Honor, at 620. But the map that you have, we offer, because this illustrates the problem with raising new factual issues in the reply brief, which is what has happened in this case. Plaintiffs presented two issues in their, to the district court, and in their opening brief, which is what effect did the Biscuit FEIS have on the planning for this Low Meadow Project? And then new information on the spotted owl. In the reply brief, and in the argument today, K.S. Wilde argues that, in fact, this habitat is suitable habitat, contrary to the express finding of the Forest Service that it was not suitable habitat. And with all due respect, K.S. Wilde simply garbles the record in asserting that the record documents that there is suitable habitat within these meadow reservations. The record says there was not. There is suitable habitat in the watershed, in the larger project planning area, but suitable habitat will not be removed in these units. When the Forest Service went out in 2004, as soon as they had the Biscuit FEIS issued in June of 2004, they immediately mobilized a team of resource specialists to walk through this 100-acre area. They walked through 340 acres of meadow restoration units, four prairies, the largest of which being 31 acres. They spent two days walking through the units, and at the end of that evaluation, they documented still no effect on threatened, endangered, sensitive species. Now, admittedly, they did not write a book, but it was the same wildlife biologist who evaluated the units in 1996, and based on his expertise, he made a decision to remove the Biscuit FEIS. He made the judgment that nothing had changed. This was a determination that was required by the Endangered Species Act. This was just not a casual observation. The Forest Service needed to send a team out to see if there had been a change, if somehow, miraculously, even though the Forest Service was expecting it to take decades more to become suitable habitat, if it somehow had become suitable habitat. Or if, in fact, the fire had disrupted the ability of the owl to disperse. And because if the Forest Service had concluded that somehow the habitat had become suitable habitat, or that the fire had disrupted the dispersal, then they would have reinitiated consultation with the Fish and Wildlife Service. And so this --. I'm going to pick up her axe in a second. Yeah, I would really like at some point to have the opportunity to explain, because this explains a misrepresentation in the reply brief. And if I don't get to it, I'm afraid that it could be confusing. So with the Court's indulgence, if I could return to that. Thank you. Okay. Please, the Court. My name is Julie Wise, and I represent the intervener appellees in this case, including the timber sale purchasers, CLR Timber Holdings. One brief issue. The start date for this project has actually moved back by a week. We had previously indicated that ground-disturbing activities would begin around September 8th. Now they will not begin any sooner than September 15th because of the availability of the helicopter. Your Honors. Till when? September 15th. No sooner than September 15th. We're all in agreement, Your Honors, that the analysis the Forest Service had to conduct was to determine whether the effects of the project presented a significantly different situation than existed back in 1997 at the time of the supplemental EA. We all agree on that. We also all agree on the arbitrary and capricious standard of review, which is highly deferential. Now, in determining how the Forest Service assessed the potential significance of the changed circumstances, I think it's helpful to start with what the Forest Service looked at back in 1997. And there are four undisputed points that it's helpful to remember. First, meadow habitat is rare on the SISKU. About 1 percent of the forest consists of meadow habitat. In this LSR, the record indicates that about 1.5 percent of the habitat is meadow habitat. And this particular project involving 140 acres would only restore one-half of 1 percent of that meadow habitat in the LSR. So we're talking about a very tiny amount of a rare habitat. Second, no one will dispute, including Ms. Parent, that meadow habitat is important ecologically. Habitat diversity leads to species diversity, leads to resilient ecosystems. A third undisputed point is that, as Your Honor was referencing, the land management direction is to restore and maintain meadow habitat. No one disputes that the Forest Plan, the Northwest Forest Plan, the Late Successional Reserve Assessment, all of the sources of land management direction indicate it's important to maintain and restore meadows. And a fourth undisputed point that I think is really key, Your Honors, is that back in 1997, the forest supervisor explicitly considered whether, rather than restoring these meadows, it was more important to allow the meadows to have an opportunity to develop into late successional habitat if they could. The record indicates that meadow habitat often doesn't have the ability to support large tree forests. That's the Late Successional Reserve Assessment indicates that maybe 50 percent of meadows left alone and allowed to have encroachment would never become late successional habitat. The forest supervisor thought, is it more important to restore this limited meadow habitat or to allow this area the opportunity to become late successional reserve habitat over a period of maybe 100 to 200 years? The forest supervisor decided no, the more important thing to do was to restore these meadows. Moving 10 plus years forward, the question then is whether new information about the Biscuit Fire or new information about threats to the owls changes that calculus. And the Forest Service properly concluded that it did not. And there are a number of reasons the Forest Service was not arbitrary and capricious. If you look at the biscuit effects, the effects of the Biscuit Fire, the Forest Service first said, okay, the fire didn't restore the meadows, that's something we still need to do. The forest said also, well, let's look at the relative abundance of meadow habitat after the fire compared with this large tree habitat. Has that somehow changed the calculus that we need to go back and supplement? And the forest, the way the forest approached this was very reasonable. The forest said meadow habitat is rare, about 1% of the forest as a whole, 1.5% of this LSR consists of meadow habitat. But most of that is in need of continuing restoration. Only about 25% of the meadows on the forest actually burned. And if we were to assume that the ones that burned were restored, the bulk of meadow habitat still needs to be restored. The forest then looked at large tree habitat and said, well, about 80% of the forest remains of the large tree forest that remained, that was in existence before the fire remained after the fire. And actually, if you look at ISER 81, you'll see the data from the Biscuit EIS for this particular late-successional reserve, the North Chetco late-successional reserve, where you will see that before the fire about 38% of the late-successional reserve was in this large tree habitat, after the fire about 34%, so a drop from 38 to 34. Based on that relative information, that most of the large tree habitat remained, that most of the meadow habitat remained in need of restoration, the Forest Service concluded, rightfully so, that the picture had not changed significantly from that analysis back in 1997. And we've already heard about the comprehensive analysis that was conducted in the Biscuit EIS. This very same forest conducted the Biscuit EIS analysis, and that certainly is something that they're charged with knowledge of under Friends of the Clearwater. And just very briefly, Your Honor, the new information regarding the Northern Spotted Owl, the Forest Service carefully looked at that information regarding the Northern Spotted Owl and concluded that it also didn't change the analysis because, among other things, we've learned, since the Northwest Forest Plan was implemented, that habitat loss due to logging and fragmentation is actually far less than was anticipated back in 1997, when the Forest Supervisor authorized this project. So there has been less habitat loss, making it even more reasonable to go forward with meadow restoration. There's no indication that habitat management is flawed in some fashion, and there's no indication that a reserve strategy can act as some sort of a buffer to invasive owls or to pathogens, whether they be viral or fungal. And so that lack of a nexus between these invasive species and the pathogens to a habitat management scheme to protect the owls indicates that this is not significant new information, even if you allowed all of the meadows to become late-successional habitat. When you say there wasn't habitat loss, you mean in this project area? I'm sorry, Your Honor? You just said the habitat loss was much less than everybody thought. Throughout the range of the Northern Spotted Owl, 24 million acres are within the range of the Northwest Forest Plan. Even with the Biscuit Fire? Yes, Your Honor. That report came out approximately in 2005, I believe, so that would have encompassed the information regarding the Biscuit Fire. Catastrophic fire is certainly one of the big losses of habitat, and it's important to allow some of these projects to go forward. Meadows actually can act as a buffer against catastrophic wildfire, and that's referenced in the 2007 memo that the Forest Service prepared. So, yes, habitat loss, despite losses to catastrophic wildfire, has proven to be much less than was actually anticipated at the time the owl was listed and at the time the Northwest Forest Plan was developed. All of this supports the Forest Service's determination, Your Honors, and we ask you to affirm the district court's opinion and to allow this project to go forward. Thank you. Thank you, Your Honors. I want to first address the what is in the record. The 2004 site visit, which is two pages in the record, the Forest Service argues here that the Forest Service used its expertise and determined that nothing had changed, and stated that this is not a casual observation. But, Your Honor, that's all the record contains, and without any evidence that there was data collected as to canopy closure or the average size of the trees, to compare it to the definition of what is owl habitat in this particular area. What was presented to the district court on suitable habitat within this projected login? Your Honor, the KS Wild has always maintained that the reason that the Biscuit Fire and the significant new information on the owl is not a casual observation is because it's a login. The reason that the owl is relevant to the requirement to supplement is because it's a login. What was presented to the district court on suitable habitat within the project? We did not present anything outside the record that's before this court now, other than in our reply brief, we referred to federal register notices, which I think this court can take judicial notice of. The reason our reply brief addresses so significantly the issue of whether or not this is owl habitat is because the government, for the first time in the Court of Appeals, decided that this is not a casual observation. The Court of Appeals stated that we had misstated that owl habitat would be logged. So we didn't present any detailed evidence of what was or was not in the project area. Moreover, Your Honor, I think based only on the record that the Forest Service supplied to the district court, we haven't created any facts. We've relied on the district court, the records that were submitted to the district court, to show that we have raised a substantial question that there is in fact owl habitat in this project area. So the reason the reply brief is so fulsome on that issue is because the Forest Service, for the first time in its answering brief here, argued that there was no owl habitat that was going to be logged. So there was a 2004 visit after the Biscuit Fire, but what this court needs to look at is, you know, the Forest Service argues that the Forest Service doesn't come in every day and say what's changed. Well that's true, however, after the Biscuit Fire, they went out and visited it, and then in 2005, the Forest Service submitted a memo to its files on this project where it concluded that it would not supplement the record. There's only a mention of the Biscuit Fire in that memo at page, it's ER 100, where it says the Biscuit Fire created more weeds in the project area. There's no reference to owls or the impacts of the project or how much owl habitat was destroyed by the project. It wasn't until 2007 memo, which was created after this litigation began and at the urging of Oregon Wild, saying what about this project, we've now had the Biscuit Fire, that the 2007 memo was created. And the problem with that memo, where they again concluded not to supplement and did look at the Biscuit Fire, is that they didn't look at a relevant factor. And under the Arbitrary and Capricious Standard of Review, if they ignore a relevant factor, an important aspect of the problem, they can't look at the Biscuit Fire. That decision is arbitrary. And the factor that they ignored, yes, they looked at whether or not the purpose and need for the project, which is stated to be meadow restoration, is there still a purpose and need? And they decided that even after the fire and even with the restoration of meadows that was going to occur in the Biscuit Recovery Project, they still needed, there was still a need to restore memos. The relevant factor that they did not examine, which is required by the regulation, is what is the bearing of this new changed circumstance on the impact of the Biscuit Recovery Project? And that is the impacts of the project. Not just on the purpose and need, but on the impacts. And those impacts will be to Northern Spotted Owls. Ms. Weiss is correct, we don't disagree that meadows may be rare, but the Northern Spotted Owl is even more rare. It's listed as a threatened species under the Endangered Species Act. There are no species, as we demonstrated in our brief, that are listed under the ESA that rely upon meadow habitat. Moreover, Your Honors, to the extent that the Biscuit Fire EIS, it sounded like the Forest Service was arguing here that the Biscuit Fire EIS looked at this low meadow restoration project. There were acres of meadow restoration projects that were examined in the Biscuit EIS, not this project. This project was listed in an effort to review other projects to look at cumulative effects. And that's where there are only the two sentences. The important query is, what are the cumulative effects on late successional habitat, not what are the cumulative effects on meadows. Because it's going to be the effect of logging this area that will have a cumulative effect in addition to the lost habitat from the fire, in addition to any other logging that occurred as a result of that. So, Your Honor, for these reasons... Do you want them to leave the meadow alone at the present time? Your Honor, I'm not sure I understand. What I tried to make clear in the reply brief, Your Honor, is this is not a dispute about whether or not a meadow has value or whether or not this particular area needs to be turned into a meadow. This is simply a request that the agency comply with the National Environmental Policy Act, which is a set of procedures, admittedly. Why are you requesting that? I mean, you've got to have some reason. Yes, Your Honor. It's highly important that the Forest Service evaluate. And all of these disputes that we're having need to happen in that NEPA process so that it can be disclosed to the public. The public, other than KS Wild and Oregon Wild, frankly, needs to weigh in on what are the effects going to be. And, in fact, perhaps the solution is they don't turn this into a meadow until 20 years from now, when some of the other owl habitat has grown more fully. But that needs to be examined in public with full disclosure so that these debates can be held, rather than simply saying, no, we're not going to look at everything, but we're not going to supplement this analysis. So that's why, and these courts have been very clear, and most recently in ONDA v. BLM, which I cited in our brief, that the NEPA process needs to be examined in public. And the NEPA process, even though it is simply a process, is incredibly important to ensuring that informed decisions are made. And that's what we're asking for here. And, finally, Your Honor, I just wanted to point out one last thing with respect to Ms. Weiss' statement about how, in 1997, the Forest Service decided that it was going to allow the meadow restoration, even though it recognized that there was a limited amount of late successional habitat within that meadow. And that was in the late successional reserve. If you look at the Forest Service's supplemental ER at page 243, the reason that the Forest Service decided this in 1997 was that because there were other, there was other mid-successional habitat that would develop into late successional habitat, if disturbance such as fire does not occur. Well, now we've had the fire. And so the Forest Service needs to reassess its determination of whether or not the effects of this logging, the effects of this logging, are going to be mitigated. And, therefore, make it still worth it to proceed with this meadow restoration project at this time. Thank you, Your Honor. Okay. Thank you very much. Your Honor, may I ask the Court a question, please? Well, what do you want to do? Would the Court be willing to accept a 28J letter in which we can point out what we believe are the new factual materials raised in the reply brief and a brief response to those factual issues? You haven't done that? Pardon me, Your Honor? You haven't covered that, have you? Is that what you're saying? No, Your Honor. I really, we firmly are of the view that there is new factual argument in the reply brief, and that, moreover, that that, the assertions of fact could be misleading to the Court. And we'd very much like to be able to point that out briefly to the Court. Well, we'll think about it. We'll let you know. Thank you, Your Honor. Okay? Thank you, Your Honor. All right. We'll recess until 9 a.m. tomorrow morning. And, you know, the arguments, this has been a great day.
judges: Pregerson, Canby, Hall